# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL WALLS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:12-cv-1152 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| TENNESSEE CVS PHARMACY, LLC, ) | |
| ) | |
| Defendant, ) | |

## MEMORANDUM

Defendant Tennessee CVS Pharmacy, LLC ("CVS") has filed a Motion for Summary Judgment (Docket No. 19), to which plaintiff Michael Walls filed a Response in opposition (Docket No. 27), and CVS filed a Reply (Docket No. 40). For the reasons stated herein, the motion will be denied.

## BACKGROUND

### I. Procedural History

Michael Walls was employed by CVS from 1998 to 2011. Walls contends that, from 2008 through October 18, 2011, he observed and reported evidence of illegal activity at multiple CVS facilities. On November 9, 2011, CVS terminated Walls, ostensibly for having violated company policy by having his wife, who was not a CVS employee, assist him in moving items within his store's storage warehouse two months earlier. Walls contends that CVS in fact terminated him for reporting illegal activity at CVS, in violation of (1) the Tennessee Public Protection Act ("TPPA"), Tenn. Code. Ann. § 50-1-304(b), and (2) Tennessee common law. CVS has moved for summary judgment on both claims.

### II. Facts

#### A. Circumstances of Walls' Termination

Walls began working for CVS in December 1998. In 2001, he was promoted to the position of store manager, a position he maintained at various CVS stores through his termination on November 9,

1

2011.  As a store manager, Walls was responsible for an entire store, although each pharmacy was under the responsibility of a pharmacist.

In 2007, Walls became the store manager for a CVS store in Madison, Tennessee (the "Madison store").  Walls observed a pharmacist, Dr. Billy Warner, who was occasionally assigned to his store, suffering from some type of mental confusion and loss of cognition.  Walls reported the issue to CVS management at a meeting of the district managers.  According to Walls, several district managers expressed that they did not want that pharmacist in their respective stores.  Nevertheless, Walls received no response concerning this issue.

While Walls served as the Madison store manager, CVS honored him as the so-called "Paragon nominee" within CVS's performance program.  Walls' District Manager at the time, Todd Mitchell, nominated him for the honor.

Approximately eight months after first raising the issue concerning Dr. Warner, Walls again raised the issue at a meeting of the district managers and in direct conversations with management.  Approximately one week after this second complaint – apparently in or about September 2008 – CVS transferred Walls to a store in the Bordeaux area of Nashville, Tennessee (the "Bordeaux store").

Within one week after Walls arrived at the Bordeaux store, Walls and a CVS pharmacist discovered over 20,000 prescription medicines in the pharmacy that were past the expiration date printed on the bottle, including some bottles that were as many as four years past their expiration date.  Given that many of the bottles were only partially full, Walls was seriously concerned that, prior to Walls' arrival, the Bordeaux store's pharmacy had been dispensing medicines to customers past the expiration date.  The medications included pain medications, anti-rejection drugs, HIV medications, and medications provided to children on a regular basis for various health issues.  Although Walls did not, and does not, know whether any customers actually received out-of-date prescription medicines before his September 2008 arrival at the Bordeaux store, it at least violated CVS company policy to have out-of-date medications at the store in the first place.  In approximately October 2008, Walls also discovered morphine in a safe that

should have been returned to the manufacturer, based on the manufacturer's recall of the product several months earlier for improper dosage.

Upon discovering this "overwhelming" volume of out-of-date medications at the Bordeaux store, Walls and the store's pharmacist removed all of the out-of-date medications from the pharmacy and packaged them separately, thereby ensuring that they would not be dispensed to customers. Also, immediately after identifying the issue, Walls reported his concerns to his superiors within the CVS hierarchy, including his District Manager, the supervising pharmacist, and the Regional Loss Prevention Supervisor.

Despite Walls' numerous reports about these serious issues, no one at CVS discussed the matter with him or otherwise apprised him of any efforts (if there were any) by CVS to investigate Walls' concerns.

In July 2010, having received no information concerning his numerous reports about the out-of-date medications, Walls sent a letter to Tom Ryan, CVS's Chairman and Chief Executive Officer. Walls' letter relayed his concerns about his discovery of the out-of-date medications at the Bordeaux store in September 2008. Unbeknownst to Walls, CVS conducted an investigation following Walls' letter to CEO Ryan. Area Loss Prevention Director Donnie Dugger and Area Director of Human Resources Sue Vandersall investigated Walls' reports of out-of-date prescription medications and found no reason to believe that any of the medications had actually been sold or dispensed to customers.[1] CVS apparently did not inform Walls of this investigation, let alone involve him in it.

Unsatisfied with the lack of a direct response from CVS, Walls also began making calls in August 2010 to a CVS "ethics hotline" maintained by a third-party provider on behalf of CVS. Walls claims that he made seven calls to the hotline between August 2010 and October 18, 2011.

---

[1] The Donnie Dugger Declaration (Docket No. 23) avers this undisputed fact. The record contains no details concerning the nature, scope, or duration of the investigation.

Having received no information from CVS after sending the July 2010 letter, Walls continued to investigate the issue of CVS stores dispensing out-of-date medications. In January 2011, Walls contacted the ethics hotline to report that, rather than returning the out-of-date medications to the company warehouse, CVS had transferred over $100,000 in out-of-date medications from a store on Thompson Lane (in Nashville, Tennessee) to a store on Nolensville Road (also in Nashville, Tennessee). On April 2011, Walls also discovered that the Bordeaux store (which he was still managing) had received out-of-date medications directly from CVS's Knoxville warehouse in a regular drug shipment. According to Walls, one of those medications even bore a "Sharpie" mark on it, indicating that another store had marked it as out-of-date and returned it to the Knoxville warehouse, which apparently turned around and shipped it to the Bordeaux store. About two weeks later, Walls again found an out-of-date medication within a shipment from the Knoxville distribution center. On both of these occasions, the pharmacist showed Walls the drugs, and Walls advised the pharmacist to report the issue to the Pharmacy District Manager, who in turn reported to the District Manager.

In approximately May 2011, Arturo Clavijo became Walls' District Manager. Shortly after becoming District Manager, Clavijo scheduled a store visit with Walls at the Bordeaux store. At the end of the meeting, Walls gave Clavijo a manila envelope containing a list of all the out-of-date medications discovered in the pharmacy upon Walls' arrival in September 2008, plus a copy of Walls' July 2010 letter to CEO Ryan about the issue. Walls and Clavijo offered conflicting testimony as to what happened next. According to Walls, Clavijo asked Walls what was in the envelope, at which point Walls informed him of its contents (both the list of out-of-date medications and the July 2010 complaint letter to CEO Ryan) and told Clavijo that he "needed to know about it." Walls also testified that, later that night, Clavijo called Walls to tell him that he had reviewed the materials. According to Walls, they had the following exchange: "[Clavijo]: 'I've looked over this and is this why you think I am after you?' [Walls]: 'Absolutely.'" Clavijo acknowledges that he received an envelope from Walls, but he denies opening it,

4

denies any knowledge of its contents, and denies that Walls ever made him aware of the out-of-date medication issue.[2]

Walls avers that he also raised the issue of the out-of-date drug shipments from the Knoxville distribution center at a manager's meeting at which Clavijo was present.

In August 2011, apparently at Walls' request to work closer to home, CVS transferred Walls to a store in Portland, Tennessee (the "Portland store"). At an unspecified point soon thereafter, Clavijo came to the Portland store for a scheduled visit. Walls avers that he again attempted to engage Clavijo in a discussion concerning Walls' concerns that the CVS distribution center was sending out-of-date drugs to CVS pharmacies. Walls avers that he told Clavijo that he (Walls) was receiving professional counseling related to these concerns. According to Walls, Clavijo told Walls he did not want to discuss the matter that day. Clavijo never followed up with Walls about his concerns.

On or about October 14, 2011, a CVS assistant store manager named Theresa Thomas, who apparently had supervised the Portland store on October 13 and 14 while Walls was on vacation, reported to Clavijo that another employee told her that several employees had brought their children to work and that "the store manager [*i.e.*, Walls] even brought his wife in to [sic] the store to help in the stock room." On October 18, Clavijo interviewed Jennifer Smith, the shift supervisor for the Bordeaux store. Based on Clavijo's notes from that interview, the gravamen of his interview with Smith concerned the presence of employees' children at the store.[3] Smith told Clavijo that CVS employees had often brought family

---

[2] Clavijo avers that Walls "handed me a manila envelope and asked that I forward it to the Regional Manager, David Purdy," that Walls "never informed me about the contents of the envelope," and that, "[a]t the direction of Human Resources[,] I placed the envelope from Mr. Walls in his personnel file without reading it." Clavijo also avers that, "[p]rior to this lawsuit, I was never made aware by Mr. Walls or anyone else that he had filed or made any complaints or reports about any illegal or improper activity at CVS, including any alleged out-of-date prescription medication at his or any other CVS stores."

[3] Clavijo's notes are in a question and answer format. None of these questions or answers concerned the fact that Mike Walls had invited his wife to assist him in the stockroom.

members to the store. Smith also stated that, in the past, her husband had assisted her in doing some work at the store, even though he was not a CVS employee.

Walls made his last call to the ethics hotline on October 18, 2011. There is no evidence in the record that Clavijo was aware of this particular call.

On or about October 19, 2011, Clavijo contacted the CVS Human Resources Manager for his area, Diana Hardin. According to Hardin, this was the first time she became aware of Walls. Clavijo continued his investigation.

On October 20, 2011, two days after Walls made his seventh and (ultimately) final call to the ethics hotline, Clavijo interviewed Walls regarding the issue of bringing family members to the Bordeaux store. Walls admitted that, on one occasion for a "just a couple of hours," his wife had assisted him in the store's stock room by throwing out trash. Walls stated that, prior to the interview with Clavijo, he did not realize that having her assist with those activities violated CVS company policy. Clavijo reviewed video footage, which confirmed that Walls's wife had entered the stockroom on the morning of August 11, 2011, and showed her taking out trash, emptying crates, and sweeping for a total of about two hours.

On October 28, 2011, Hardin wrote to Clavijo, copying Regional Manager Josh Duquette, asking for more specific information related to the Bordeaux investigation.

Based on email correspondence in the record, it appears that, on November 3 and 4, 2011, Clavijo communicated with Hardin, Regional Loss Prevention Manager Todd Crowell, and Duquette about the presence of employees' family members at the Bordeaux store, including Walls' wife and the other employees' children. According to an email from Clavijo, Crowell informed Clavijo that an employee named Trish McKee once had her husband come into a store to assist her on the sales floor while District Manager Wendy Gerbrands was her supervisor. Although McKee had received a demotion, CVS's records did not indicate why McKee had been demoted.

Clavijo therefore spoke with McKee to determine the basis for her demotion. Based on that conversation, Clavijo informed Hardin, Duquette, and Crowell that McKee was demoted solely for job

6

performance issues unrelated to the presence of her husband at the CVS store, and that, according to McKee, "nothing was ever said about" the latter issue.

Walls also made a written statement dated November 3, 2011. In the statement, Walls acknowledged that his wife had assisted him in removing trash and "old fixtures" on the date at issue but stated that he "thought nothing of it" at the time.

Hardin's notes regarding the investigation contain the following notations: "3192 – as punishment 42 miles" and "ethics call." Although Hardin stated at deposition that she had no recollection that she was ever made aware of Walls' protected activity, Walls argues that these notes should be construed as indicating Hardin's awareness that Walls may have been transferred to the Bordeaux store located 42 miles away as punishment for complaining about the Madison pharmacist ("3192" apparently corresponds to the Madison store under CVS's internal store numbering designations) and that Hardin was aware that Walls had called the ethics hotline.

According to Hardin and Clavijo, CVS has a "zero tolerance policy" for any employee who permits a non-employee, such as a relative, to perform work at a CVS store in violation of wage and hour laws. However, at deposition, Hardin could not identify any written policy to that effect. Instead, she testified that it was something managers "should know" and that "it's just . . . a known policy." Furthermore, although she characterized it as a "zero tolerance policy" requiring termination, she testified that CVS handled each case on an individual basis.

At some point between November 3, 2011 and November 9, 2011, Clavijo, in consultation with Hardin, chose to terminate Walls. According to Clavijo, Hardin specifically approved of the termination decision. On November 9, 2011, Clavijo terminated Walls. In the "Counseling and Coaching Form" that Clavijo issued to Walls (who refused to sign it), Clavijo wrote that Walls' conduct in allowing his wife to work at the store was "a serious violation of CVS policy on Timekeeping and Payroll as well as Federal and State Wage and Hour Laws. The company has a zero tolerance policy for violation of these policies and not paying individuals for working."

7

Walls avers that (1) he is not aware of any policy that specifically addresses family members assisting CVS employees in the workplace, and (2) he did not receive any training concerning this issue.

The record contains no indication that Walls received any formal discipline at CVS prior to his termination on November 9, 2011.[4]

### B. Facts Concerning Alleged Comparators

At his deposition, Clavijo could not recall taking any disciplinary action against Smith, even though she had admitted that her (non-employee) husband had assisted her at the store. Furthermore, although Smith informed Clavijo that individuals at other stores had been bringing their children into the stores during work, Clavijo did not seek to identify or discipline any employees who had engaged in that conduct.

In 2008, while Walls was managing the Bordeaux store, Colleen Lomanto assisted Walls in remodeling the Bordeaux store as part of a company-wide remodeling project. Ms. Lomanto's then-boyfriend Carlos, who was not a CVS employee, helped with the remodeling by placing trash and fixtures in the construction dumpsters, among other work. Towards the end of the three-week remodeling process, Walls' District Manager Wendy Gerbrands joined Walls, Ms. Lomanto, and Carlos in finishing the remodel after the Bordeaux store had closed on one particular night. Ms. Lomanto subsequently married Carlos. Despite having utilized her significant other to assist her at the Bordeaux store in front of her District Manager, Ms. Lomanto was not disciplined. In fact, she was subsequently promoted to her current position as a Loss Prevention Regional Manager.

---

[4] In his brief, by reference to his deposition and his Complaint, Walls states that the "last two stores" he managed "mov[ed] to a rating of excellence for the first time in thirteen and fourteen years, respectively." The cited deposition testimony does not support the statement, and the Complaint, which does include this statement, is not admissible evidence. Although CVS does not appear to dispute Walls' unsupported representation in its Reply, the court will disregard it for purposes of the motion.

8

Finally, as noted above, Clavijo determined during his investigation that McKee had brought a relative to work but was not disciplined by Gerbrands, her District Manager at the time, for that misconduct.

## ANALYSIS

### I. Legal Standard for TPPA and Common Law Retaliatory Discharge Claims

To show a claim under the TPPA, a claimant must establish the following four elements: (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in, or remain silent about, illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437 (Tenn. 2011); *Sykes v. Chattanooga Housing Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011); *see also Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528 (Tenn. 2002); *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997). To show a common law claim of retaliatory discharge, a plaintiff must show: "(1) that an at-will employment relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the plaintiff was the employee's exercise of protected rights or compliance with clear public policy." *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 800 (Tenn. 2010); *Guy*, 79 S.3d at 535.[5] Retaliatory discharge claims extend to employees who have reasonable cause to believe

---

[5] Elements 3 and 4, as articulated in *Kinsler* and other Tennessee cases, are arguably inconsistent regarding causation – namely, whether "the" reason for the discharge was the exercise of protected activity (*i.e.*, the only reason), as opposed to merely a "substantial factor" in the decision to discharge the employee (*i.e.*, one of multiple reasons). However, in *Kinsler* and other cases, Tennessee courts have consistently applied the lower "substantial factor" causation standard to Tennessee common law retaliatory discharge claims. *See, e.g.*, *Kinsler*, 320 S.W.3d at 800 (analyzing whether plaintiff established that protected activity was a "substantial factor in

a law, regulation, or rule has been violated or will be violated. *Williams v. Greater Chattanooga Public Tele. Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) (citing *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997)).

The first three elements of a TPPA claim and a common law retaliatory discharge claim are identical. However, with respect to causation, the TPPA requires a plaintiff to show that "his whistleblowing behavior was the *sole* reason for his termination," *Johnson v. BellSouth Telecomms, Inc.*, 512 F. App'x 566, 570 (6th Cir. 2013) (quoting *Guy*, 79 S.W.3d at 537) (emphasis in original), whereas a common law retaliatory discharge claim requires only that the whistleblowing behavior was a "substantial factor" in the termination. A factor is "substantial" if it was "an important or significant motivating factor for the discharge." *Coleman v. Humane Society of Memphis*, 2014 WL 587010, at *26 (Tenn. Ct. App. Feb. 14, 2014) (quoting *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 800 (Tenn. 2010)).

The TPPA statutorily requires the application of the *McDonnell Douglas* burden-shifting framework to claims accruing on or after June 11, 2011. *See* Tenn. Code Ann. 50-1-304(g); *Williams v. City of Burns*, 2013 WL 4068180, at *2 (Tenn. Ct. App. Aug. 12, 2013).[6] Courts also routinely apply the *McDonnell Douglas* framework to common law retaliatory discharge claims. *See, e.g., Riddle v. First Tenn. Bank, Nat'l Assoc.*, 497 F. App'x 588, 598 (6th Cir. 2012); *Hugo v. Millenium Labs., Inc.*, — F. Supp. 2d — , 2014 WL 37659, at *7 (E.D. Tenn. 2014).[7]

---

[the employer's] decision to discharge him); *Guy*, 79 S.W.3d at 535 ("The plaintiff . . . must demonstrate that the employer's violation was a substantial factor in the employee's discharge") (internal quotation and emphasis omitted).

[6] Walls' claim accrued on November 9, 2011, the date of his termination. Therefore, § 304(g) applies to Walls' TPPA claim.

[7] The court has not located any authority explicitly addressing whether the codification of the *McDonnell Douglas* standard in § 304(g) of the TPPA affected the summary judgment standard for common law retaliatory discharge claims. However, the parties here assume that the *McDonnell Douglas* standard applies to both the statutory and common law retaliatory discharge claims, and federal and state courts have continued to apply the *McDonnell Douglas* framework

## II. *Prima Facie* Case

CVS contends that Walls cannot establish the "knowledge" and "causation" elements of his *prima facie* case.

With respect to the knowledge element, CVS argued in its opening brief that, based on Clavijo's denials of any knowledge, Walls cannot show that Clavijo knew that Walls had engaged in protected activity at CVS on multiple occasions before his November 2011 termination. However, the Walls Affidavit contradicts Clavijo's testimony: Walls contends that he and Clavijo discussed Walls' protected activity multiple times, that Clavijo told Walls that he read the contents of the envelope that Walls had provided to him, and that Clavijo was also aware of Walls' concerns based on statements that Walls made at a manager's meeting in Clavijo's presence. The conflicting testimony presents a disputed issue of fact that the court must construe in the light most favorable to Walls. Viewed in that light, Walls has satisfied the knowledge element of his *prima facie* burden at summary judgment. A jury will ultimately determine whether to credit Clavijo's testimony over Walls' testimony.[8]

With respect to the "causation" element, CVS argues that (1) Walls cannot establish "sole" causation under the TPPA and/or (2) Walls cannot establish that his protected activity was a "substantial factor" in his termination relative to his common law retaliation claim. For the reasons explained in *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 800 (M.D. Tenn. 2010), the court does not accept Walls' contention that temporal proximity alone is sufficient to establish the causation element for either claim. *See also Provonsha v. Students Taking a Right to Stand, Inc.*, 2007 WL 4232918, at *5 (Tenn. Ct. App.

---

to the common law retaliatory discharge claims both before and after the passage of § 304(g). This court will do the same.

[8]Similarly, with an appropriate evidentiary foundation at trial, a jury could construe Hardin's notes as reflecting her knowledge that Walls may have been transferred from the Madison store to the Bordeaux store for complaining about Dr. Warner and that Walls had called the ethics hotline at some point during or prior to Clavijo and Hardin's investigation in October and November 2011.

Dec. 3, 2007) (citing *Mason v. Seaton*, 942 S.W.2d 470 (Tenn. 1997)); *see also Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995). The causation standard for retaliation claims was explained in *Provonsha*:

> Evidence of causation requires more than the facts showing employment, the exercise of rights, and a subsequent discharge. It requires direct evidence or compelling circumstantial evidence. The plaintiff's mere belief or understanding of why he was dismissed is not sufficient to create a genuine issue of material fact. The Tennessee Supreme Court has rejected the idea that a short length of time between the incident and the dismissal constitutes a prima facie showing of retaliation. While the *Conatser* court quoted a treatise stating "proximity in time without evidence of satisfactory job performance does not make a prima facie case," some evidence of plaintiff's satisfactory job performance is not compelling circumstantial evidence of the causal connection.

2007 WL 4232918 (internal citations and quotations marks omitted) (quoting *McCain v. Airport Honda*, 1996 WL 557794 (Tenn. Ct. App. Oct. 2, 1996)). Evidence of pretext is also admissible to establish the causal connection. *Todd v. Shelby Cnty.*, 407 S.W.3d 212, 225 (Tenn. Ct. App. 2012).

Here, the court finds sufficient evidence to create a genuine dispute of material fact concerning the causation element of both claims. Construing the facts in the light most favorable to Walls, Walls was a model employee for the entirety of his tenure at CVS prior to the single incident at issue in this lawsuit. Walls repeatedly complained to CVS about very serious issues at multiple CVS facilities, including the likelihood that multiple stores were receiving, dispensing, and/or (at a minimum) failing to return out-of-date medications. Walls complained to his supervisors, the ethics hotline, and the company CEO, but no one communicated with him about the issue and, at every turn, the individuals to whom he complained either dodged the issue or told him they were "working on it." Walls informed his new District Manager, Clavijo, about these issues when Clavijo became his supervisor in May 2011. Clavijo did nothing. Walls again raised his concerns to Clavijo in August 2011. Clavijo told Walls that he did not want to talk about the issue, and Clavijo again did nothing.

Two months later, Clavijo learned that Walls had violated company policy on a single occasion by allowing his wife to work at the store. Clavijo also learned that several other employees had violated company policy by bringing family members to the store. Clavijo's investigation of these accusations

12

soon focused only on the accusation concerning Walls, which Walls admitted to having committed. Pursuant to a purported "zero tolerance" policy that was not memorialized in writing, that was not the subject of specific training, and that CVS apparently selectively enforced, Clavijo terminated Walls within, at most, approximately 60-75 days of the last time that Walls had complained to him.[9] Given that Clavijo did nothing in response to extremely serious allegations by Walls relating to matters of public health – the dispensation of out-of-date medications and the continued circulation of out-of-date medications by the Knoxville distribution center – a jury could infer that Clavijo's choice to bring the hammer down on Walls for a single infraction after 13 years as a model employee was in fact retaliatory. The jury could also find that the relative proximity between Walls' protected activity and his termination supports the requisite causal connection. Similarly, for the reasons explained in the pretext section herein, the fact that CVS may have taken no action against Smith and McKee for substantially identical conduct supports a causal connection between Walls' protected activity and his termination.

Of course, Walls' burden at trial to prove his TPPA claim will be more difficult than proving his common law retaliatory discharge claim, because he will need to prove that Clavijo's stated reason for terminating Walls (as approved by Hardin, if not others) was the *only* actual reason for Walls' termination. Although it is a closer call with respect to the TPPA claim than the common law claim, the court finds that Walls has established a genuine dispute of material fact concerning the causation element of both the TPPA and retaliation claims.

---

[9] Walls argues that the court should measure "proximity" in relation to Walls' October 18, 2011 final call to the ethics hotline. However, there is no evidence that Clavijo was aware of that call. In fact, the evidence shows that Clavijo received word on or about October 14, 2011 that Walls might have violated company policy – before that last call was placed. Therefore, the court has measured the relevant temporal proximity by reference to Walls' August 2011 complaint to Clavijo, which appears to be the last direct complaint by Walls to Clavijo referenced in the record. Also, as noted above, it is conceivable that a jury could construe Hardin's notes as reflecting Hardin's awareness of whistleblowing activity by Walls, although it would require Walls to establish an appropriate evidentiary basis for that inference.

**III. Pretext**

To show pretext, a plaintiff can establish: (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the termination; or (3) the proffered reason is insufficient to explain the termination. Here, Walls does not specify which of these three theories he is pursuing. However, Walls argues that he was treated differently than similarly situated employees, which is consistent with the standards for the third manner for proving pretext. The court therefore will analyze only this third type of pretext theory.

When an employee argues that the proffered reason was insufficient to motivate his discharge, he must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [the plaintiff]." *Blizzard v. Marion Tech. College*, 698 F.3d 275, 286-87 (6th Cir. 2012). The employee can meet this burden by showing that the comparator was "similarly situated with respect to the severity and frequency of [his] performance errors." *Id.* (citing *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001)).[10] This type of rebuttal is a "direct attack[] on the credibility of the employer's proffered motivation for firing [the] plaintiff and, if shown, provide[s] an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Manzer*, 29 F.3d at 1084 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

---

[10] *Majewski* concerned the "*prima facie*" elements of an age discrimination claim under the ADEA at the summary judgment stage, the fourth element of which a plaintiff can satisfy by showing that he was "'similarly situated' to employees who were not in the protected class, and that those employees were treated better than he was." 274 F.3d at 1116. As stated in *Majewski*, such employees must be treated similarly if they are "'similarly situated' in all respects." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Curiously, in *Blizzard*, the Sixth Circuit essentially imported the "similarly situated" analysis for a *prima facie* case (where such a comparison is required relative to the discrimination/retaliation claim at issue) into the *pretext* analysis. In some contexts – not the one presented here – this approach would seem to make the *prima facie* and pretext inquiries redundant.

14

502 (1993)).[11]  "[S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case."  *Manzer*, 29 F.3d at 1084.

Walls argues that Smith, McKee, and/or Ms. Lomanto were engaged in substantially identical conduct for which they were not terminated.  During Clavijo's investigation, Smith admitted to Clavijo that, with Walls' permission, she had allowed family members to work at the store.  Although Clavijo terminated Walls for essentially the same conduct, he did not discipline Smith, let alone terminate her.  CVS contends that Smith's conduct was not "substantially identical" because she was an Assistant Manager supervised by Walls and, therefore, was held to a lower standard than Walls.  Although this theory is plausible, CVS does not identify any testimony from Clavijo (or anyone else at CVS) stating that CVS treated Walls differently from Smith because Walls had condoned and failed to report Smith's admitted misconduct.  In fact, based on the record before the court, there appears to be no stated explanation in the record for the difference in treatment.  Drawing all reasonable inferences in favor of Walls, a jury reasonably could reject this purported distinction proffered by CVS.

With respect to McKee, the record shows that Clavijo ascertained from McKee that she was not disciplined – let alone terminated – for bringing a non-employee relative to work for her.  As CVS points out, McKee's admitted misconduct occurred while Gerbrands, not Clavijo, was her District Manager.  CVS argues that McKee's circumstances were therefore not substantially identical, because Clavijo simply sought to enforce CVS policy more strictly than Gerbrands.  The problem for CVS is that the

---

[11] CVS relies on *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715 (6th Cir. 2004) for the proposition that a plaintiff's circumstances must be "nearly identical" to those of the comparator to satisfy the pretext inquiry.  The court will rely on the more recent formulation in the Sixth Circuit's published opinion in *Blizzard*, which requires that, for purposes of proving the third theory of pretext, the circumstances must be "*substantially* identical."  *See also Hedrick v. W. Reserve Care Sys.*, 366 F.3d 444, 460 (6th Cir. 2004) ("substantially identical").   Some Sixth Circuit cases do seem to use the terms interchangeably, making it unclear whether there is a meaningful practical distinction between circumstances that are "nearly" identical as opposed to "substantially" identical.  At any rate, the court notes that its decision would be the same under either formulation.

15

distinguishing elements it attributes to McKee – and to Smith – do not comport with its purported "zero tolerance policy," requiring termination for bringing a relative to work. If CVS had a zero tolerance policy, as Clavijo and Hardin maintained at the time and at deposition, CVS (via Gerbrands) was required to terminate McKee when she brought a relative to work, and CVS (via Clavijo) was required to terminate Smith when she admitted to Clavijo that she had brought a relative to work.  Furthermore, both Clavijo and Hardin were made aware during their investigation that McKee was not disciplined (let alone terminated) for bringing a relative to work, yet Clavijo and Hardin chose to terminate Walls, despite his impeccable previous employment record.  The point is particularly acute with respect to Smith: if Clavijo in fact was a "zero tolerance" disciplinarian, as CVS characterizes him, Clavijo presumably would have terminated Smith for the same conduct, disciplined her in some way, or, at a minimum, provided some justification for not disciplining her while terminating Walls.  Clavijo's failure to undertake any of these measures supports a finding of pretext and tends to show that any asserted differences between Smith and Walls are not relevant.  Taking all of these considerations into account, the court finds that there is sufficient evidence to reach the jury as to whether Smith and McKee are appropriate comparators to establish pretext.

As to Ms. Lomanto, the evidence shows that District Manager Gerbrands permitted Ms. Lomanto's boyfriend to work at the store some years prior to the incident involving Walls.  However, unlike the circumstances of Smith and McKee, there is no evidence in the record that Clavijo and/or Hardin (or any other alleged decisionmakers) were aware of Ms. Lomanto's circumstances when they agreed to terminate Walls.  Therefore, the fact that Gerbrands simply failed to discipline Ms. Lomanto at some point in the past, without the issue ever coming to the attention of the decisionmakers for Walls' termination, does not tend to prove that Clavijo and/or Hardin consciously treated Walls differently than Ms. Lomanto because of Walls' whistleblowing activity.  Therefore, Ms. Lomanto is not an appropriate comparator.

In sum, there is a genuine dispute as to whether the fact that Walls engaged in protected activity was the sole cause of, or a substantial factor in, CVS's decision to terminate Walls. CVS certainly has plausible arguments in its favor, a jury could credit Clavijo's position that he was not aware of Walls' protected activity in the first place, and Walls will have an uphill climb to show that retaliation was the only reason for discharge (relative to the TPPA claim). However, it will be for a jury to make credibility determinations and to determine the actual reason (or reasons) why CVS terminated Walls for a single incident after thirteen years as a model employee.

## CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District